*In re* MARRIAGE OF MICHAEL A. RUSSELL, Petitioner, and SANDRA V. RUSSELL, Respondent (William Shenberger *et al.*, Intervenors-Appellees; Donald G. Russell II *et al.*, Intervenors-Appellants).

Second District   No. 2—87—0867

Opinion filed May 4, 1988.

Nancy H. Mindrup, of Rockford, for appellants.

David A. North, of Rockford, for appellees.

JUSTICE DUNN delivered the opinion of the court:

Intervenors, Donald G. Russell II and S. Ann Russell (the Russells), appeal from a circuit court order awarding guardianship of the person and estate of their nephew, Steven Russell (Steven), to Steven's maternal grandparents, intervenors William Shenberger and Jean Shenberger (the Shenbergers). The Russells argue the court abused its discretion when it awarded guardianship of Steven to the Shenbergers. The Russells also argue the court erred in considering a portion of a report submitted by the guardian *ad litem*. We affirm.

On December 16, 1983, the marriage of Michael A. Russell (Michael) and Sandra V. Russell (Sandra) was dissolved by court order. Custody of the parties' minor child, Steven, was awarded to Michael. On September 9, 1986, Michael died, leaving a valid will. Section 9 of the will named Michael's brother, Donald G. Russell II (Donald), as guardian of the person and estate of his minor children.

On September 15, 1986, Sandra filed a petition for order of protection seeking custody of Steven. On the same day, the Russells filed a petition for custody and injunction requesting temporary and permanent custody of Steven on grounds that Donald was appointed

guardian in Michael's will and Sandra was unfit. The court entered an order granting temporary custody to the Russells. On September 17, the Shenbergers motioned for leave to intervene and petitioned the court to grant them custody of Steven. The court granted the Shenbergers' request to intervene and allowed them to file their petition in intervention. The Russells withdrew their petition for custody and injunction and were granted leave to file an amended petition for custody. The court awarded temporary custody to the Shenbergers.

On October 14, Michael's will was admitted to probate. On December 16, Sandra withdrew her petition for custody, stating that she did not wish to contest or further participate in the custody proceedings. Included in this pleading was Sandra's statement that it was in the child's best interests that custody be granted to her parents, the Shenbergers. On April 2, 1987, the Russells' amended petition for leave to intervene was granted. On July 10, 1987, the cause proceeded to a hearing on the question of the guardianship of the minor. At the outset, the parties agreed to consolidate the dissolution case and the probate case because of the common question of guardianship.

At the hearing, Jean Shenberger, Steven's 50-year-old maternal grandmother, recounted that in October 1981, while Michael and Sandra were in Tampa, Florida, Michael was involved in a serious motorcycle accident that resulted in extensive hospitalization and permanent paralysis from the waist down. In March 1982, Michael was transferred to a hospital in Milwaukee. On March 8, Steven was born. Shortly thereafter, Michael was released from the hospital and went to live with Sandra and Steven at the Shenbergers' home in Argyle, Illinois. In August, the Shenbergers moved to a three-bedroom house on a lake in a rural subdivision four miles west of Montello, Wisconsin. Michael, Sandra and Steven moved with the Shenbergers to Montello and remained there until February 1983, when they moved to Rockford.

Some months later, Michael petitioned for dissolution of the marriage. When the marriage was dissolved, Sandra left Rockford. Michael remained in Rockford with Steven. Mrs. Shenberger said that despite the divorce she and her husband remained in contact with Michael and Steven and visited frequently until the time of Michael's death in September 1986. Mrs. Shenberger agreed it was important for Steven to maintain contact with his father's family and she would therefore accommodate reasonable and seasonable visitation arrangements with the Russell family.

Extensive testimony was also presented by other witnesses concerning Steven's daily routine in Montello during the period the Shen-

bergers had temporary custody. Briefly stated, the operator of the preschool Steven attended and a baby-sitter who cared for Steven while he was not in preschool testified that Steven was well adjusted and was not a disciplinary problem. In addition, the president of the Montello Board of Education testified regarding the stature of the schools Steven would attend if he remained in Montello.

Donald Russell testified that he was 26 years old and had been steadily employed since his graduation from high school in 1978. Donald had been married for five years to S. Ann Russell (Ann) and while they as yet had no children, they hoped to start a family in the near future. The Russells lived in a two-story, three-bedroom house in Loves Park, Illinois. The neighborhood was an older one populated by numerous children.

Donald lost contact with Michael, Sandra and Steven when they were living in Montello. Contact resumed when Michael and Steven moved back to Rockford. After Michael's suicide attempt in 1984, Donald and Ann visited Michael and Steven more often. Donald and Ann told Steven about his father's death and took care of Steven during the wake and funeral. Donald denied keeping Steven from the Shenbergers. He stated there had been no visitation problems since the Shenbergers obtained temporary custody. Donald said obtaining custody was important because he felt he could give Steven a stable home, and it was basically what his brother wanted. Donald stated he would adopt Steven later on if possible. He did not foresee any problems developing if he and Ann had a child of their own.

Ann Russell testified she worked as a housecleaner and occasionally baby-sat for a three-month-old baby. Ann said she would quit the housecleaning job if she and Donald were awarded custody of Steven because she wanted to be at home for Steven. Ann described herself as a basic housewife who enjoyed riding bicycles to the two parks nearby the Russells' home. After Michael's divorce, Ann's contact with Michael and Steven increased. She periodically cooked and cleaned for Michael and drove Steven to preschool. Ann stated that Steven was always glad to see her and Donald and wished they could visit longer.

While Steven was in the temporary custody of the Shenbergers, Ann maintained contact with Steven through telephone calls, visits, and cards. The Shenbergers had never turned down their requests for visitation, although the Shenbergers had on one occasion denied them extended visitation. Ann concluded that she and Donald would be better guardians because they were younger, they were doing what Michael wanted, and they loved Steven very much.

Supporting the Russells' petition for guardianship were Donald's stepmother and stepfather. Their testimony indicated that Donald and Ann had a sound marriage and a close parent/ child-type relationship with Steven.

One week later at a hearing, the court informed counsel that it had examined the record and was appointing a guardian *ad litem* to review the record, visit the parties, and report back in two weeks. Neither counsel objected to the two persons proposed by the court to serve as the guardian *ad litem*. The court further stated, "It's halfway settled in my mind, I'm just not sure. *** I apologize deeply for the delay but again like I say I've got my mind I think made up. But I don't have that feeling that I should have at this point. Something doesn't jump in my mind. They are both good people. I understand that."

By letter, the guardian *ad litem* notified the court that he had reviewed the court records in the dissolution and probate proceedings, had met with counsel for both sides, and had visited the Shenbergers and the Russells. The guardian *ad litem* stated it was his impression the Shenbergers were "very well intentioned parties who are mature, organized and have a well thought out plan for raising Steven if the Court should award them custody. They appear very capable of providing Steven a stable and suitable home. They also appear best able to facilitate visitation between Steven and his other relatives." The guardian *ad litem* added that "Steven's adjustment to the Shenbergers' home appears to be very successful," and the Shenbergers are committed to giving first priority to Steven's welfare. Regarding the Russells, the guardian *ad litem* stated they are somewhat settled and ready to provide a loving home for Steven if given the opportunity. He added he was somewhat concerned about the Russells' ability to provide structure and detail necessary for Steven, especially in his education and visitation with the Shenbergers. The guardian *ad litem's* letter lastly stated that although both parties, without doubt, were qualified to raise Steven, it was his opinion the Shenbergers' maturity, stability, and experience in raising children stood out in qualifying them in the dispute over custody. The guardian *ad litem* concluded it would be in the best interests of Steven that he continue to live with the Shenbergers.

On July 10, 1987, the court notified counsel at a hearing that after reviewing the record and the recommendation of the guardian *ad litem*, the court was awarding the care, custody, and control of Steven to the Shenbergers. The court stated its decision was in the best interest, well-being, and welfare of the minor child.

On appeal, the Russells first contend the court abused its discretion in overriding the guardianship provision in the will of the deceased custodial parent. Relying on *In re Estate of Suggs* (1986), 149 Ill. App. 3d 793, the Russells assert the determining standard in guardianship proceedings is the best interests of the child. The Russells argue that here, as in *Suggs*, the best interests of the child would equally be served regardless of whether the Russells or the Shenbergers were appointed guardians and, therefore, the wishes of the deceased custodial parent should control. The Russells maintain that failing to uphold the testamentary desires of the decedent would discourage parents from naming guardians in their will. In addition, they argue that testamentary nominees should take priority similar to that accorded to parents in guardianship proceedings.

The Shenbergers respond that *Suggs* is not dispositive because the court determined it was in the best interests of the child for the Shenbergers to be named guardians of the minor and there was ample evidence supporting the court's decision. They maintain the best interests of the child supersede the desires of the parental testamentary nomination.

Before proceeding to the relevant Illinois law it is noteworthy that the question presented has yielded two primary schools of thought. (Annot., 67 A.L.R.2d 803, 810-16 (1959).) The majority of jurisdictions have concluded the best interests of the child is the controlling factor in appointing a guardian, and the testamentary nomination is not binding where the court determines in its sound discretion that another party is better suited to act as guardian. (67 A.L.R.2d 803, 810 (1959).) A minority of jurisdictions have determined the testamentary nominee should be appointed as guardian if qualified, and it does not appear the appointment will be detrimental to the child. 67 A.L.R.2d 803, 813 (1959).

In Illinois, the best interests and welfare of the minor is the determining question in a guardianship proceeding. (*Suggs*, 149 Ill. App. 3d at 798; *In re Adoption of Scheidt* (1980), 89 Ill. App. 3d 92, 97; *In re Estate of Stark* (1975), 33 Ill. App. 3d 626, 628.) Consequently, the feelings and desires of the adult parties must yield to the court's obligation to protect the best interests of the minor child. (*Suggs*, 149 Ill. App. 3d at 798; *Stark*, 33 Ill. App. 3d at 628-29.) Although the court's determination need not be governed by the best-interest standards for a custody determination set forth in section 602(a) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 602(a)), they should be considered when relevant. (*Suggs*, 149 Ill. App. 3d at 799; *Scheidt*, 89 Ill. App. 3d at

96-97.) A guardianship determination will not be disturbed unless the trial court has clearly abused its discretion or its decision is against the manifest weight of the evidence. *Scheidt*, 89 Ill. App. 3d at 99.

■ In *Suggs*, the court applied the standards set out in section 602(a) and concluded that aside from the first factor, *i.e.*, "the wishes of the child's parent or parents as to his custody," the record indicated appointment of either party seeking guardianship would be in the best interests of the child. Under such circumstances, the court determined the wishes of the parent would be the determinative factor. Here, contrary to *Suggs*, no finding was made that the best interests of the child would be served by either party. Rather, the court determined the best interests of the child would be served by the Shenbergers. This determination was based on the extensive testimony presented at the guardianship hearing and the recommendation of the guardian *ad litem*. We are not persuaded the trial court abused its discretion or that its decision in favor of the Shenbergers was against the manifest weight of the evidence.

There is no denying the choice was a difficult one. This is manifest from the court's appointment of a guardian *ad litem* at the conclusion of the evidentiary hearing. However, despite the court's expressed uncertainties, the court ultimately decided in favor of the maternal grandparents. Our review of the record as summarized earlier indicates there was sufficient evidence supporting the court's decision. Furthermore, in a case such as this one where both parties appear qualified to have guardianship of the minor, observation of the witnesses' demeanor is acutely important. Temperaments, personalities, and other relevant intangible factors simply cannot be gleaned from reviewing the transcript of proceedings. (See *In re Marriage of Soraparu* (1986), 147 Ill. App. 3d 857, 863.) Because the trial court was in a better position to evaluate these critical factors, we must defer to its discretion and uphold its determination.

In upholding the trial court's determination, we do not intend to discourage the testamentary practice of nominating guardians for minor children. (Ill. Rev. Stat. 1985, ch. 110½, par. 11—5.) Parental intent as to who should care for their minor children is an important factor to be considered in a guardianship proceeding and, as in *Suggs*, may be the determinative factor. However, the best interests of the child are paramount, and parental wishes must yield to this overriding concern.

■ The Russells also contend the court erred in failing to disregard the portions of the guardian *ad litem*'s report that were based on personal opinion and facts outside the record. The Russells rely on

*In re Marriage of Pool* (1983), 118 Ill. App. 3d 1035, 1040, wherein it was held that an attorney serving in the dual capacity of guardian *ad litem* and representative of the minor children pursuant to section 506 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 506) improperly based his closing argument on facts not admitted into evidence and erred in injecting his personal opinion into his closing argument. The facts not in evidence were independent interviews with persons who did not testify at trial; the personal opinion concerned the guardian *ad litem's* custody recommendation. The Russells maintain the analysis in *Pool* is equally applicable to the court's consideration of the written report filed by the guardian *ad litem* in the present case. We are not persuaded.

First, we agree with the Shenbergers that the Russells have waived consideration of the propriety of the court's consideration of facts outside the record gathered by the guardian *ad litem*. When the guardian *ad litem* was appointed, the court advised counsel that he wanted the guardian *ad litem* to "interview both your clients, to visit the particular areas, whatever he feels necessary, in addition to what I am looking at *** (and) report back within two weeks." The court later inquired whether either party desired a written report. Counsel for the Russells said he did, and it was so ordered. Counsel for the Shenbergers did not object to the guidelines set forth by the court. In fact, counsel apparently agreed to be interviewed by the guardian *ad litem*. In view of counsel's acquiescence to the court-imposed obligations of the guardian *ad litem*, there is no basis at this juncture for objecting to the inclusion in the report of facts outside the record.

Second, the role of the guardian *ad litem* in *Pool* was significantly different from the guardian *ad litem* below. In *Pool*, the guardian *ad litem* was an attorney appointed to represent the interests of the minor in the custody proceedings and serve as a guardian *ad litem*. The objectionable material was presented during closing argument and was clearly in violation of established law on the scope of closing argument. (*Pool*, 118 Ill. App. 3d at 1040.) Here, the guardian *ad litem* was appointed after the conclusion of the hearing on guardianship. The substance of the report was predicated on conduct specifically ordered by the court and was not objected to by counsel. Therefore, *Pool* is inapposite.

Regarding the court's reliance on the personal opinion of the guardian *ad litem* contained in the report, counsel objected only "to the extent that it is based, that his opinion is based on anything outside the Court record." Counsel did not object to the opinion *per se*. Since we have found that counsel agreed to the court order permit-

ting the guardian *ad litem* to make inquiry outside the record, we conclude that this issue was also waived.

Aside from waiver, we find nothing objectionable in the court's consideration of the guardian *ad litem's* recommendation. It is manifest that the court sought the guardian *ad litem's* personal opinion on the question of guardianship. It is clear from the record that all parties were aware of the court's intentions at the time the guardian *ad litem* was appointed. The court apparently wanted confirmation that its choice was the proper one. There is nothing to indicate this was not accomplished by the guardian *ad litem's* report.

We note finally that we do not express any opinion on the propriety of appointing a guardian *ad litem* after the completion of the guardianship hearing as this issue was conceded to be waived by the Russells. We merely hold that under the particular circumstances of the present case, the court's consideration of the report of the guardian *ad litem* did not amount to reversible error.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

WOODWARD and INGLIS, JJ., concur.